UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Automated Telemarketing Services, Inc,　　　　　　　　Civil No. 09-1308 (DWF/FLN)

　　　　　　　Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　　　　　　　　**MEMORANDUM**
　　　　　　　　　　　　　　　　　　　　　　　　　　**OPINION AND ORDER**
Aspect Software, Inc.,

　　　　　　　Defendant.

_____

Dawn C. Van Tassel, Esq., and Justin H. Perl, Esq., Maslon Edelman Borman & Brand, LLP, counsel for Plaintiff.

Andrea L. Martin, Esq., and Shepard Davidson, Esq., Burns & Levinson LLP; and David M. Aafedt, Esq., and Erin A. Oglesbay, Esq., Winthrop & Weinstine, PA, counsel for Defendant.
_____

## INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment brought by Defendant Aspect Software, Inc. ("Aspect") and a Motion for Partial Summary Judgment brought by Plaintiff Automated Telemarketing Services, Inc. ("ATS"). For the reasons set forth below, the Court grants in part and denies in part both motions.

## BACKGROUND

This is a breach of contract case involving a Sales Representative Agreement ("SRA") between the parties. ATS asserts three claims against Aspect: breach of contract (Count One), breach of the covenant of good faith and fair dealing (Count Two),

and tortious interference (Count Three). (Second Am. Compl. ¶¶ 52-57, 58-63, 64-76.)[1]
Aspect denies ATS's allegations and asserts several affirmative defenses, including an
affirmative defense that ATS's claims are barred by a non-compete provision in the SRA.

On or about July 17, 2003, ATS entered into the SRA with Melita International,
Inc. ("Melita"). (Second Am. Compl. ¶ 7, Ex. A ("SRA").) Melita's rights and
obligations under the SRA were assumed by Aspect, its successor in interest. (Second
Am. Compl. ¶ 6.) The SRA provides that ATS would serve as Melita's (and later
Aspect's) exclusive sales representative for the purpose of marketing and selling
Melita's/Aspect's software products and services in a designated territory that
encompassed most of the Midwestern region of the United States. (SRA § 1.1(a).)[2] In
return, the SRA entitled ATS to commissions based on its sales of Melita/Aspect
products and services. (*Id*. § 4.1.)

The term of the original SRA expired on July 16, 2006, but it was subject to
renewal of successive one-year terms upon prior written agreement of the parties, with
agreement not to be unreasonably withheld. (*Id*. § 1.3.) The SRA was renewed annually,

---

[1] ATS voluntarily dismissed Count Four of the Second Amended Complaint. (Doc. No. 72.)

[2] The "Territory" initially included the states of Iowa, Minnesota, Nebraska, North Dakota, South Dakota, Wyoming, Montana, Wisconsin, Missouri, Kansas, and Oklahoma. (SRA § 1.1.) The Territory was later amended to include Colorado and Utah and to eliminate Oklahoma. (Second Am. Compl. ¶ 10.)

the last time being on January 1, 2008. (Decl. of Curtis G. Marks ("Marks Decl.") ¶ 4, Ex. C.)

Aspect either terminated or elected not to renew the SRA in 2009. Aspect claims that it elected not to renew the SRA as of December 31, 2008. (Aff. of Dawn C. Van Tassel ("Van Tassel Aff.") ¶ 2, Ex. A (Dep. of Michael Provenzano) at 93.) According to ATS, on December 28, 2008, Aspect verbally notified ATS that it would not renew the SRA if a 2008 quota was missed, without telling ATS where it was in terms of the quota or how big the shortfall was. (Marks Decl. ¶ 15.) Aspect sent ATS written notice of non-renewal or termination in a letter dated January 1, 2009:

> Please accept this as formal notice that, due to the failure of [ATS] to meet its 2008 sales Quota, Aspect has decided not to renew the [SRA] dated July 17, 2003 . . . for an additional one-year term. Our current one-year term with ATS ends on December 31, 2008. Pursuant to Section 5.3 of the Agreement, ATS has an additional 90 day period to complete all Aspect business.

(Marks ¶ 19, Ex. E; Second Am. Compl. ¶ 22.)[3]

Aspect now moves to dismiss ATS's claims. In addition, ATS moves for partial summary judgment on its claim that Aspect breached the SRA by refusing to pay commissions due and on Aspect's fifth affirmative defense.

---

[3] Facts leading up to the non-renewal or termination are contested. ATS alleges generally that Aspect unjustifiably hindered ATS's performance under the SRA with the intention of preventing ATS from reaching its sales quota for 2008 so that Aspect could elect not to renew the SRA.

3

# DISCUSSION

## I. Summary Judgment

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II. Aspect's Motion for Summary Judgment

### A. Breach of Contract-Failure to Renew

In Count One, ATS asserts that Aspect improperly failed to renew the SRA after December 31, 2008. Aspect argues that under Paragraph 7.1 of the SRA, ATS has expressly waived any right to a claim for breach of the SRA that is *not* based on the failure to pay commissions. Article 7 of the SRA provides as follows:

> ARTICLE 7. <u>Disclaimer of Warranty; Limitation of Liability</u>
>
> 7.1 [ATS] acknowledges that [Aspect] makes no warranty of any kind to [ATS], whether express or implied, respecting any [Aspect] products or services or their use or application. [ASPECT] EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTY OF MERCHANTABILITY AND FITNESS. Except with respect to net commissions earned, due and payable under this Agreement, reduced by any charge backs, credits and setoffs, [Aspect] shall have no liability of any kind to [ATS] whether in contract in [sic] tort, including negligence. In no event shall [Aspect] be liable for any damages of any kind, whether direct, indirect, special, incidental, consequential or other, including without limitation any loss of profits, loss of data or its use, or other incidental or consequential damages, however caused.

(SRA ¶ 7.1.) Aspect argues that Paragraph 7.1 constitutes a general waiver that bars ATS as a matter of law from pursuing its breach of contract claim based on Aspect's failure to renew the SRA. Aspect also argues that even if ATS could maintain this breach of contract claim, Paragraph 7.1 bars ATS's claim for lost profits.

ATS asserts that the SRA's purported waiver of liability is unenforceable under Georgia law because it lacks explicitness, prominence, clarity, and lack of ambiguity.

Under Georgia law,[4] a contracting party may waive all liability for breach of contract. *See Imaging Sys. Int'l Inc. v. Magnetic Resonance Plus, Inc.*, 490 S.E.2d 124, 127 (Ga. Ct. App. 1997). However, an exculpatory clause in a contract must be explicit, prominent, clear and unambiguous. *Parkside Center, Ltd. v. Chicagoland Vending, Inc.*, 552 S.E.2d 557, 561 (Ga. Ct. App. 2001); *see also Grace v. Golden*, 425 S.E.2d 363, 365 (Ga. Ct. App. 1992). Indications that an exculpatory clause is sufficiently explicit, prominent, and clear include: being set forth in a separate paragraph; using a heading for the clause; and using bold or distinguishing type-face.

The Court first concludes that there is no ambiguity with respect to Paragraph 7.1. The third and fourth sentences state that except for claims for net commissions earned that are due under the SRA, "[Aspect] shall have no liability of any kind to [ATS] . . . in contract" and that "[i]n no event shall [Aspect] be liable for any damages of any kind, whether direct, indirect, special, incidental, consequential or other, including without limitation any loss of profits, loss of data or its use, or other incidental or consequential damages, however caused." (SRA ¶ 7.1.) There is no question that this language is explicit and certain in its meaning and that it unambiguously provides that ATS waived its contract claims that are based on Aspect's alleged unjustified hindrance of ATS's performance under, and failure to renew, the SRA.

The Court also concludes that the exculpatory clause is sufficiently prominent. While the substance of the exculpatory clause itself is not itself in larger or bold print, the

---

[4] The SRA is construed according to Georgia law. (SRA ¶ 8.4.)

exculpatory clause appears in a separate article and under the heading "<u>Disclaimer of Warranty; Limitation of Liability.</u>" (SRA ¶ 7.1.) The fact that Paragraph 7.1 addresses both the disclaimer of warranty and the limitation of liability is not enough to make the clause unenforceable, as the heading indicates that it address *both* disclaimer of warranty and the limitation of liability. The clause is not buried or camouflaged in the SRA and is clearly marked so as to alert a reader that Paragraph 7.1 contains waiver language.

Accordingly, the Court concludes that ATS has waived its breach of contract claims that are based on Aspect's decision not to continue in business with ATS, including specifically ATS's claim that Aspect's failure to renew the SRA was unreasonable and that Aspect breached the SRA by setting unreasonable quota numbers. Thus, Aspect is entitled to summary judgment on ATS's breach of contract claim insofar as it relates to Aspect's alleged unjustified hindrance of performance under, and unreasonable failure to renew, the SRA.

### B.     Termination and Notice

ATS also alleges that Aspect breached the SRA because Aspect failed to give reasonable notice of termination. In particular, ATS asserts that Aspect gave at most three days verbal notice of its intent to terminate the SRA and that such notice is unreasonable and therefore a breach of the SRA. ATS's claim of unreasonable notice is based on the argument that Aspect terminated, and did not simply fail to renew, the SRA. ATS asserts that the failure to give reasonable notice is prohibited by Georgia's statutory

law.⁵ Under Georgia law, the "[t]ermination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable." Ga. Code § 11-2-309(3).

While Aspect used the words "decided not to renew" in describing the end of its business relationship with ATS, there are facts in the record that, when viewed in the light most favorable to ATS, could lead a reasonable juror to conclude that the SRA was actually terminated. For example, the fact that Aspect's January 1, 2009 letter to ATS invokes Section 5.3 to give ATS a ninety day period to complete all Aspect business suggests that Aspect actually terminated the SRA.⁶ If a fact-finder were to conclude that Aspect terminated the SRA, that fact-finder would also have to decide whether the notice given by Aspect was reasonable. Accordingly, summary judgment on this claim is inappropriate, and ATS's breach of contract claim, insofar as it relates to reasonable notice under statutory law, survives.

---

⁵ This claim is based on Georgia's statutory requirement that a party to a contract give reasonable notice of the termination of a contract. Aspect has not provided support for why this claim would be covered by the exculpatory clause of Paragraph 7.1.

⁶ As explained below, Section 5.3 of the SRA gives ATS additional time to complete certain Aspect sales if the SRA is either terminated *or* not renewed at the conclusion of the Initial Term. There is no claim that Aspect chose not to renew "at the conclusion of the Initial Term."

### C. Breach of Covenant of Good Faith and Fair Dealing

The parties agree that Georgia law does not recognize a stand-alone claim for violation of the covenant of good faith and fair dealing. *See, e.g., Myung Sung Presbyterian Church, Inc. v. North Am. Assoc. of Slavic Churches & Ministries, Inc.*, 662 S.E.2d 745, 810 (Ga. Ct. App. 2008). Aspect asserts that this claim must be dismissed as an independent claim and, alternatively, that ATS has no evidence that Aspect breached the covenant.

ATS contends that it has a viable claim for a breach of the covenant because it has a viable claim for breach of the SRA. In particular, ATS asserts that uncontested facts establish a breach of the covenant of good faith and fair dealing. However, all of the facts that ATS cites to relate to its claim that Aspect breached the SRA by unreasonably failing to renew the SRA, setting unreasonable quota numbers, and generally unjustifiably hindering ATS's performance under the SRA. (Second Am. Compl. ¶¶ 60-63; Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. at 16-19.) Because, as discussed above, Aspect has waived its right to assert its claim for breach of contract on these facts, Aspect is similarly entitled to summary judgment on ATS's claim for breach of the covenant of good faith and fair dealing.

### D. Tortious Interference

In Count Three, ATS asserts that Aspect should be held liable for tortious interference for (1) interfering with the non-compete agreements of two ATS employees, Lori Amundson and John Spartz; and (2) interfering with ATS's customer relations.

### 1. Tortious Interference with Contract

In order to prevail on a tortious interference with contract claim, ATS must demonstrate the existence of a contract, the alleged wrongdoer's knowledge of the contract, and an intentional procurement of its breach, without justification, that results in damage to the plaintiff. *Maness v. Star-Kist Foods, Inc.*, 7 F.3d 704, 709 (8th Cir. 1993) (citing *Furlev Sales and Assocs., Inc. v. North American Auto. Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn. 1982)).

ATS claims that both Amundson and Spartz had restrictive covenants that precluded them from working with Aspect, that Aspect induced the breaches of those covenants by hiring Amundson and Spartz in Spring 2009, and that ATS was injured as a result of the breach of the restrictive covenants.

Aspect asserts that ATS's tortious interference with contract claims fail as a matter of law, however, because the restrictive covenants were not enforceable when Aspect hired Amundson and Spartz, working for Aspect did not violate either restrictive covenant, and ATS could not have suffered damage.

Amundson and Spartz each executed non-compete agreements with ATS, both of which are governed by Minnesota law. Amundson's non-compete reads in relevant part:

> Therefore, in exchange for our offer to employ you, the compensation and benefits that we will provide to you if you accept our offer of employment, and our promise to grant you access to our confidential information and entrust you with our client goodwill, you hereby agree that during your employment, and for eighteen (18) months following the termination of your employment, for any reason, you will not directly or indirectly, for yourself or on behalf of any other person or entity, for the purpose of competing with ATS, (a) solicit or acquire any business from, and/or perform verification/investigative services for, any person or entity that was

10

> a [sic] ATS client during the eighteen (18) months preceding the
> termination of your employment, or (b) in any way interfere with a
> relationship between such person or entity and ATS.

(Aff. of Lori Amundson ¶ 4, Ex. 1.)

Spartz's non-compete reads in relevant part:

> In exchange for our willingness to employ you, and your continued
> employment and other benefits as we may be providing you at the time of
> execution of this Confidentiality/Non-Disclosure and Non-Compete Policy,
> you agree that during your employment, and for one (1) years thereafter,
> you will not directly or indirectly for yourself or anyone else, solicit any
> business from and/or perform substance abuse services for any entity who
> was one of our clients or customers during the one (1) years preceding the
> termination of your employment for any purpose which would be
> competitive with the business of [ATS] or any 3rd party we represent.

(Aff. of Andrea L. Martin ¶ 11, Ex. J.)

Aspect first argues that Amundson's non-compete is not enforceable because it was not supported by independent consideration. Under Minnesota law, where a restrictive covenant is not ancillary to the initial oral employment contract, it must be supported by independent consideration to be enforceable. *Nat'l Recruiters, Inc. v. Cashman*, 323 N.W.2d 736, 740 (Minn. 1982). In support of its argument, Aspect cites to Amundson's affidavit testimony wherein she asserts that she did not sign the restrictive covenant until four days after she began working for ATS and that she was told that she must execute the covenant to receive a paycheck. (Amundson Aff. ¶¶ 3-5.) There is also record evidence, however, that ATS sent Amundson a letter on October 16, 2008, before Amundson began working for ATS, that reads as follows:

> We are pleased to make an offer of employment to you as a [sic] Account
> Executive for ATS, Inc. . . .  This offer is contingent upon the following:
>  . . .

> 3. Your signature on our Standard Confidentiality non-Compete Agreement.

(Second Marks Decl. ¶ 6, Ex. H.) Amundson's offer letter expressly states that the job offer was contingent on her signature of the non-compete. Thus, there is, at a minimum, a fact issue as to whether Amundson's non-compete is enforceable on these grounds.

Aspect also argues that even if the restrictive covenants were enforceable, Amundson and Spartz did nothing to violate them. In particular, Aspect points out that each of the respective non-competes prohibit certain activities that are competitive with ATS. Aspect further argues that because ATS was effectively out of business when Amundson and Spartz were hired, neither one could have been competing with ATS. The Court agrees.

While the date that ATS went out of business is disputed, there is no evidence in the record that Amundson or Spartz were or could have been competing with ATS at the time they went to work for Aspect. Amundson began working for Aspect on May 26, 2009, and Spartz began working for Aspect in April 2009. (Second Aff. of Dawn C. Van Tassel ¶ 12, Ex. S (Dep. of Lori Amundson) at 37; Aff. of Andrea L. Martin ("Martin Aff.") ¶ 5, Ex. D (Dep. of John Spartz) at 79.) The evidence in the record also establishes that after Aspect ended its relationship with ATS in January 2009, ATS did not enter into any other revenue generating business activities. (Martin Aff. ¶ 4, Ex. C (Dep. of ATS) at 37.) Thus, no reasonable juror could conclude that Amundson or Spartz was competing with ATS when they went to work for Aspect or that ATS could

have experienced any actual loss as a result of their alleged breaches of the non-competes.

### 2. Tortious Interference with Customer Relationships

ATS asserts that Aspect also interfered with ATS's customer relationships by, for example, slowing the delivery of services to customers in late 2008. In support, ATS cites to evidence that there were significant delays in 2008 with the installation of Aspect products for an ATS customer that were allegedly caused by "Aspect engineers not understanding" how to install the products effectively. (Second Van Tassel Aff. ¶ 6, Ex. M.) ATS also cites to the deposition testimony of John Spartz, wherein he acknowledged that while working for ATS in 2008, he spent more time than in prior years servicing accounts because of installation problems, and that several customers expressed dissatisfaction with Aspect's services. (Dep. of John Spartz at 19-23.) Viewing the record in the light most favorable to ATS, the Court concludes that there are factual issues precluding summary judgment on ATS's claim for tortious interference with customer relationships.

## III. ATS's Motion for Partial Summary Judgment

In its motion for partial summary judgment, ATS alleges that Aspect breached the SRA by failing to pay commissions due under the SRA.[7] In particular, ATS asserts for the period commencing on January 1, 2009, and concluding on April 1, 2009 (a total of

---

[7] There is no dispute that this claim is explicitly exempted from the exculpatory clause in Article 7.

90 days), ATS was entitled to complete sales of Aspect's products and services to its customers. Moreover, ATS asserts that it is entitled to full commission payments so long as the products were accepted by the client prior to July 1, 2009 (90 days after April 1, 2009). Aspect claimed that it paid ATS for all sales that "revenued as of 3/31/2009" and that no additional commissions were due. (Marks Decl. Ex. F.) ATS contends, however, that it closed additional sales prior to April 1, 2009 that were accepted by the client between April 1, 2009 and July 1, 2009, for which commissions are due and owing and for which Aspect has failed to pay. (Van Tassel Aff. ¶ 6, Ex. E; Marks Decl. ¶ 22 & Ex. F.) ATS asserts specifically that it took into revenue over $1.9 million during the second quarter of 2009, that it was entitled to 28% commission on the revenue (totaling roughly $540,000), and that Aspect did not pay these commissions.

Aspect denies that ATS is entitled to additional commissions. Aspect argues that the language of Section 5.3 makes clear that it applies only if the termination or non-renewal occurred at the conclusion of the Initial Term and therefore does not apply here. Aspect also argues that ATS has not established that any of the claimed $1.9 million in revenue qualified for commissions.

Section 5.3 of the SRA provides:

> If this Agreement is terminated (for reasons other than breach by the [ATS]) or not renewed at the conclusion of the Initial Term, [ATS] is entitled to an additional 90 day period in which to complete [Aspect's] business. Any contracts signed during the Initial Term, or the 90 day period following, for which [Aspect] receives its full payment, shall entitle [ATS] to its full commission; provided, however, that [ATS] is only entitled to commissions on all such sales where the customer is contractually scheduled and actually accepts the product within 90 days

14

> after the 90 day period following the termination or expiration of the Agreement.

(SRA § 5.3.) The parties first dispute whether Section 5.3 applies to the facts of this case. In particular, Aspect argues that the language of Section 5.3— "[i]f this Agreement is terminated . . . or not renewed at the conclusion of the Initial Term"— indicates that Section 5.3 only applies in cases of termination or non-renewal at the end of the Initial Term. Aspect further asserts that the Initial Term is defined as the period from July 17, 2003 through July 16, 2006, and because the SRA was not renewed in 2009, the termination/non-renewal does not fall within Section 5.3. ATS reads Section 5.3 differently and asserts that the section contemplates two scenarios in which ATS would be entitled to a "wind-down" period—either upon termination of the SRA *or* upon non-renewal upon expiration of the SRA's Initial Term.

The Court agrees with ATS's reading of Section 5.3. Section 5.3 provides that it applies "[i]f this Agreement is terminated . . . *or* not renewed at the conclusion of the Initial Term." (SRA § 5.3 (emphasis added).) The use of the word "or" separates the two clauses of the sentence and there is no indication that the language "at the end of the Initial Term" is intended to apply to the first clause that refers to termination. Thus, the Court concludes that Section 5.3 applies upon termination of the SRA, regardless of when the termination occurs.[8]

---

[8] This interpretation is supported by evidence in the record that Aspect paid some commissions to ATS pursuant to Section 5.3 and that Aspect expressly invoked Section 5.3 in its January 1, 2009 letter.

15

Based on the above, if a fact-finder determines that Aspect terminated the SRA, as opposed to failed to renew the SRA, the fact-finder will also be required to calculate what commissions are owed. ATS asserts that the Court can determine the amount of commissions owed as a matter of law, claiming that it is owed $540,347.64. ATS arrived at this amount be multiplying the gross amount of revenue that Aspect recognized in the second Quarter of 2009 ($1, 929,813) by a 28% commission rate. (Plf.'s Mem. of Law in Supp. of Mot. for Partial Summ. J. at 8.)

Aspect argues that ATS is not entitled to summary judgment on the commission claim because the evidence that ATS relies on does not indicate, for example, that the sales in evidence were made in ATS's Territory or that the stated revenue generated was from sales that would be covered by Section 5.3. In addition, Aspect asserts that the evidence does not support ATS's claim for commissions because ATS has not demonstrated that 28% is the appropriate commission rate or that Aspect did not already pay commissions for the relevant sales.

The Court concludes that factual issues exist with respect to the amount of commissions that ATS is owed under Section 5.3. Thus, the Court denies ATS's motion for summary judgment on its claim for unpaid commissions and leaves this issue for trial.[9]

---

[9] ATS also moves for summary judgment on Aspect's fifth affirmative defense, wherein Aspect asserts that "ATS's claims are barred in whole or in part because ATS is barred from competing with Aspect for a period of 18 months following the termination of the SRA." (Ans. to Second Am. Compl. at 7.) Aspect explains that this defense only
(Footnote Continued on Next Page)

## CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS ORDERED** that:

1. Aspect's Motion for Summary Judgment (Doc. No. [73]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

    a. ATS's breach of contract claim, insofar as it is based on allegations that Aspect unjustifiably hindered ATS's performance under or unreasonably failed to renew the SRA, is **DISMISSED WITH PREJUDICE**.

    b. ATS's breach of contract claim, insofar as it is based on the allegations that Aspect failed to give reasonable notice prior to terminating the SRA, remains viable.

    c. ATS's claim for breach of the covenant of good faith and fair dealing (Count Two) is **DISMISSED WITH PREJUDICE**.

    d. ATS's claim for tortious interference with contract is **DISMISSED WITH PREJUDICE**.

---

(Footnote Continued From Previous Page)

relates to ATS's claim for tortious interference with contract and that it was asserted as a precaution in the event that the Court did not grant Aspect's motion for summary judgment on this claim. The Court has granted Aspect's motion on ATS's tortious interference with contract claim. Accordingly, this issue is moot and Aspect's fifth affirmative defense is dismissed.

e. ATS's claim for tortious interference with customer relationships remains viable.

2. ATS's Motion for Partial Summary Judgment (Doc. No. [76]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a. Aspect's fifth affirmative defense is **DISMISSED WITH PREJUDICE**.

b. ATS's motion is otherwise denied.

Dated: November 15, 2010  s/Donovan W. Frank
DONOVAN W. FRANK
United States District Judge